# EXHIBIT A

Dockets.Justia.com

**AFFIDAVIT OF DR. SCOTT LEWIS IN SUPPORT OF PLAINTIFF
1ST TECHNOLOGY, LLC'S APPLICATION FOR DEFAULT JUDGMENT**

STATE OF CALIFORNIA     )
                        ) ss.
COUNTY OF SANTA CLARA   )

I, SCOTT W. LEWIS, Ph.D., being first duly sworn, deposes and states as follows:

1.  I am the Chief Executive Officer of Plaintiff, 1ST TECHNOLOGY LLC, and am over the age of legal majority in the State of Nevada. I am competent and qualified to testify to the issues set forth in this affidavit.

2.  I am the sole inventor of U.S. Patent 5,564,001 (the '001 Patent) entitled, "Method and System for Interactively Transmitting Multimedia Information Over a Network which Requires a Reduced Bandwidth", which was issued on October 8, 1996. The Court has entered a Default in the case of *1st Technology LLC v. Rational Enterprises, et. al* in favor of 1st Technology LLC and against the following Defendants: Bodog Entertainment Group, S.A.; Bodog.Net; and Bodog.Com (hereinafter referred to as the "Bodog Entities"). 1st Technology LLC has been damaged in the amount of $46,597,849, at the very least, due to the actions of the Bodog Entities. This affidavit will set forth all bases for this calculation of damages.

3.  As an initial matter, I am well qualified to perform this calculation of damages. My background includes a Bachelor's Degree and a Master's Degree in Engineering from the Massachusetts Institute of Technology, a Doctorate in Digital Signal Processing from Oxford University as a Marshall Scholar, and an MBA from Harvard Business School. Additionally, I have founded and acted as Chief Executive Officer of multiple companies in Silicon Valley and as a Merger and Acquisition and Strategy Consultant for both the Boston Consulting Group and the L.E.K. Consulting Group.

4.  I would like to point out that the factors used in this calculation of damages are each extremely conservative at each level of the calculation and each factor has been substantiated with evidence.

/ / /

5.    The '001 Patent enables providers of online games to operate at a higher level of interactivity and higher quality than would ordinarily be possible without the '001 Patent techniques. The Bodog Entities have implemented, and continue to implement, the '001 Patent techniques by using software on their websites which is downloaded before use and periodically thereafter (typically at least once a year to incorporate software optimization updates).    Therefore, 1st Technology LLC's damages from Bodog's unauthorized use of the '001 Patent are best determined through a royalty formula applied to each and every download of the infringing software which incorporates the '001 Patent techniques.  This model can be used for royalty computations to be applied to the Bodog Entities in calculating damages due.

6.    The calculation must start with an existing licensing agreement at its base.  There is already a licensing agreement in effect with Wagerworks, Inc. (now a subsidiary of International Gaming Technologies, Inc. - IGT) and MGM Mirage, Inc. (hereinafter referred to as the "IGT/MGM Agreement").  A true and correct copy of the IGT/MGM Agreement is attached to the Application for Default Judgment as Exhibit C.   This Agreement requires payment of $1.00 per "New User" from users 1 through 100,000, $0.75 from users 100,001 through 200,000, and $0.50 for each New User beyond 200,000 users.  In general, this is a very conservative agreement (and covered by a "Most Favored Nation" provision), since, for each New User, there will likely be multiple infringing software downloads per year.  Additionally, the IGT/MGM Agreement uses a definition for New Users that spans all geographies (for simplicity in calculating the royalty), whereas 1st Technology LLC only demands damages from Defendant Bodog Entities for downloads to the United States based users. 66% of the Bodog Entities users are in the United States.  *See* article from Alexa.com, a true and correct copy of which is attached hereto as Exhibit D.  Thus, the royalty rates indicated in the IGT/MGM Agreement should be raised by one-third to fairly compare with the Bodog Entities United States user download data utilized in this damage calculations.  However, for simplicity, 1st Technology LLC is only requesting the same royalty rates as those used in the IGT/MGM Agreement (on a New User basis).

///

2

7.    To calculate damages in this case to 1st Technology from the Bodog Entities infringements, one simply needs to multiply the royalty rates as set forth in the IGT/MGM Agreement by the number of user downloads.

8.    According to Forbes interview with the Founder of the Bodog Entities, Calvin Ayre, and Forbes research as part of their World's Billionaire Report, the Bodog Entities had a reported 16 million customers worldwide in 2005 and 18 million customers worldwide in 2006 (an average of 1.5 million per month). *See* article obtained from http://www.forbes.com/free_forbes/2006/0327/112.htnl, a true and correct copy of which is attached hereto as Exhibit E. Alexa.com, a leading internet traffic recordation site, in early 2007 indicated that 66% of Bodog.Com's worldwide traffic was from United States users. *See* Exhibit D. If one further incorporates an extremely conservative projection for Bodog's infringing business to remain at 11.88 million United States users (zero future growth, 66% x 18M, and downloads at only one download per user) for the remaining life of the '001 Patent (through October 4, 2013), this is a conservative estimate, given that the online gaming industry is experiencing rapid growth projections.

9.    Given these parameters, I have set forth the calculations for past damages, totaling $10,412,780 in Table 1, attached to my affidavit. This includes damages starting from the July 22, 2005 infringement notice date, up through March 14, 2007. Table 1B, attached to this affidavit, is a spreadsheet calculating future damages using the conservative new user royalty rates of the IGT/MGM Agreement. The present values of royalties for future damages use a conservative 5% discount rate when, in fact, the average current inflation rate is in the 2.5 to 3.5% range. This results in an extremely conservative future damage total of $37,044,517. Thus, this results in an extremely conservative total damage figure of $46,597,849.

10.    I must emphasize that these totals of damages are very small compared with the enormous level of monetary infringement and gain by the Defendant Bodog Entities, as calculated in Table 2, attached to this affidavit. For the period of past and future infringement damages (July 22, 2005 through October 4, 2013), the cumulative transaction inflows for the Bodog Entities,

1   assuming no growth and projected very conservatively, totals $65 billion dollars, with an after tax

2   cumulative profit of $486 million dollars. The calculated total damages represents only 9.6% of

3   those monetary gains. Lastly, the approximately $47 million dollars in total damages that 1st

4   Technology LLC requests represents a mere 4.7% of Calvin Ayre's current $1 billion dollar net

5   worth, as calculated by Forbes. This wealth was derived in large part through infringement of 1st

6   Technology LLC's '001 Patent and my own innovation as its sole inventor.

7       Further your affiant sayeth naught.

8       DATED this _20th_ day of March, 2007.

9

10

11                        SCOTT W. LEWIS, Ph.D.

12

13   Sworn to and subscribed before

14   me this _20th_ day of March, 2007.

15

16 

17   Notary Public

18

19    BLANCHE S. BERGER
      COMM. #1426711
      NOTARY PUBLIC – CALIFORNIA

20       SAN FRANCISCO COUNTY
      My Comm. Expires July 21, 2007

21

22

23

24

25

26

27

28

4

# TABLES 1 TO 2

**TABLE 1**
Bodog Damages

**TABLE 1A**
Past: 7/22/05 to 3/14/07 (1.6 yrs) (19.6 months)

| Uniqes Customers/Downloads | Millions World | % U.S. (Alexa.com) | Total U.S. | % of Yr. Infringing (from 7/22/05 Notice Date) | Total U.S. Infringing Millions | Royalty Due $M ($1.00/download, 1-100,000) | ($0.75/download, 100,001-200,000) | ($0.50/download, 200,001+) | Total Royalty Due $M |
|---|---|---|---|---|---|---|---|---|---|
| 2005 (Forbes) | 16.00 | 66% | 10.56 | 43.9% | 4.63 | | | $2.2 | $2.4 |
| 2006 (Forbes) | 18.00 | 66% | 11.88 | 100.0% | 11.88 | | | $5.9 | $5.9 |
| 2007 (assume no growth) | 18.00 | 66% | 11.88 | 20.6% | 2.44 | | | $1.2 | $1.2 |
| (Alexa.com Internetworldstats) | | | | | | $0.1 | $0.1 | | |
| TOTAL | | | | | 18.96 | | | Total $M | $9.6 |
| | | | | | | | | Total $ | $9,553,332 |

**TABLE 1B**
Future: 3/15/07 to 10/04/13 - Term of Patent 5,564,001

| Unique Customers/Downloads | Millions World | % U.S. (Alexa.com) | Total U.S. | % of Yr. Infringing (from 7/22/05 Notice Date) | Total U.S. Infringing Millions | Total Royalty Due $M ($0.50/download) | Present Value $M (@5% Discount Rate/Yr) | Past & Future Total $M |
|---|---|---|---|---|---|---|---|---|
| 2007 (Alexa, Internetworld) | 18.00 | 66% | 11.88 | 79.4% | 9.43 | $4.7 | $9.00 | |
| 2008 | 18.00 | 66% | 11.88 | 100.0% | 11.88 | $5.9 | $5.66 | |
| 2009 | 18.00 | 66% | 11.88 | 100.0% | 11.88 | $5.9 | $5.39 | |
| 2010 | 18.00 | 66% | 11.88 | 100.0% | 11.88 | $5.9 | $5.13 | |
| 2011 | 18.00 | 66% | 11.88 | 100.0% | 11.88 | $5.9 | $4.89 | |
| 2012 | 18.00 | 66% | 11.88 | 100.0% | 11.88 | $5.9 | $4.65 | |
| 2013 (1/1/13-10/4/13) | 18.00 | 66% | 11.88 | 75.07% | 8.92 | $4.5 | $3.33 | |
| TOTAL | | | | | 77.75 | Total $M $37.04 | Total $M $37,044,517 | $46.60 |
| | | | | | | | Past & Future Total $ | $46,597,849 |

**TABLE 2**
Percents of Bodog Value Comparisons

| | | As a % |
|---|---|---|
| Past & Future Damages ($M): | $47 | 100.0% |
| Bodog Cum. Transaction Revenue (2005 $7.3B rev. Forbes x 8.9yrs) | $64,970 | 0.1% |
| Bodog Cum. After Tax Profit (2005 $54.6M Forbes x 8.9yrs) | $486 | 9.6% |
| Bodog Est. 2006 Valuation (Forbes Richest Billionaires) | $1,000 | 4.7% |

# EXHIBIT B

1  Mark A. Hutchison (4639)
   L. Kristopher Rath (5749)
2  Hutchison & Steffen, LLC
   Peccole Professional Park
3  10080 Alta Drive, Suite 200
   Las Vegas, Nevada 89145
4  Telephone:  (702) 385-2500
   Facsimile:   (702) 385-2086
5
   Attorneys for Plaintiff
6  1st TECHNOLOGY LLC

7              UNITED STATES DISTRICT COURT

8                 DISTRICT OF NEVADA

9  1ST TECHNOLOGY LLC,              )      2:06-cv-01110-RLH-GWF
                                    )
10              Plaintiff,          )
                                    )
11         v.                       )      **NOTICE OF ENTRY OF DEFAULT
                                    )      OF DEFENDANTS BODOG
12                                  )      ENTERTAINMENT GROUP, S.A.,
   RATIONAL ENTERPRISES LTDA.,      )      BODOG.NET AND BODOG.COM**
13 RATIONAL POKER SCHOOL LIMITED,   )
   BODOG ENTERTAINMENT GROUP        )
14 S.A., BODOG.NET, BODOG.COM, and  )
   FUTUREBET SYSTEMS LTD.,          )
15                                  )
                Defendants.         )
16                                  )

17         PLEASE TAKE NOTICE that a Default against each of the following Defendants, BODOG

18 ENTERTAINMENT GROUP, S.A., BODOG.NET and BODOG.COM, was entered on February

19 26, 2007 in the above- matter.  A copy of said Default is attached hereto.

20         DATED this 28th day of February, 2006.

21                                  HUTCHISON & STEFFEN, LLC

22

23                                  _____
                                    Mark A. Hutchison (4639)
24                                  L. Kristopher Rath (5749)
                                    Peccole Professional Park
25                                  10080 W. Alta Drive, Suite 200
                                    Las Vegas, Nevada  89145
26
                                    Attorneys for Plaintiff
27                                  1st TECHNOLOGY LLC

28

1

## CERTIFICATE OF SERVICE

2    Pursuant to N.R.C.P. 5(b), I certify that I am an employee of HUTCHISON & STEFFEN,

3 LLC and that on this ___ day of February, 2007, I caused the above and foregoing document

4 entitled: **NOTICE OF ENTRY OF DEFAULT OF DEFENDANTS BODOG**

5 **ENTERTAINMENT GROUP, S.A., BODOG.NET AND BODOG.COM** to be served via

6 electronically through ECF/PACER to the attorneys listed below:

7
**Andrew P Gordon**
8
McDonald Carano Wilson
2300 W Sahara Avenue
9
Suite 1000-10
Las Vegas, NV 89102
10
agordon@mcdonaldcarano.com

11

12                                         Denette Young
                                   An employee of Hutchison & Steffen, LLC
13

14    2645-001
      G:\A\Lewis, Scott\Rational Enterprises\Pleadings\NOE.Defaults.wpd
15

16

17

18

19

20

21

22

23

24

25

26

27

28

HUTCHISON & STEFFEN
A PROFESSIONAL LLC
PECCOLE PROFESSIONAL PARK
10080 ALTA DRIVE, SUITE 200
LAS VEGAS, NEVADA 89145

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| 1st Technology, LLC, | ) |
| Plaintiff(s), | ) |
| | ) |
| vs. | ) |
| | ) |
| | ) |
| Rational Enterprises, Ltda., et al., | ) |
| | ) |
| Defendant(s). | ) |

Case # ___2:06-CV-01110-RLH-GWF___

**DEFAULT**

It appearing from the records in the above-entitled action that Summons issued on the ___Original___ Complaint ___09-07-2006___

(Original, Amended, etc)    (Date Complaint was filed)

has been regularly served upon each of the Defendants hereinafter named; and it appearing from the affidavit of counsel or Plaintiff and the records herein that each of said Defendants has failed to plead or otherwise defend in said action as required by said Summons and provided by the Federal Rules of Civil Procedure

Now, therefore, on request of counsel for Plaintiff, the DEFAULT, as aforesaid, of each of the following Defendants ___Bodog.com, Bodog.net, and Bodog Entertainment Group S.A.___

in the above-entitled action is hereby entered.

DATED: ___02-26-2007___    LANCE S. WILSON, CLERK

By: /s/ Aaron Blazevich

**Deputy Clerk**

# EXHIBIT C

## LICENSE AND SETTLEMENT AGREEMENT

THIS AGREEMENT entered into this 13th day of May 2003, by and between Scott Lewis (hereinafter "Licensor") and WagerWorks, Inc. (hereinafter "Licensee").

## WITNESSETH

WHEREAS, Licensor owns the entire right, title and interest in and to United States Patent No. 5,564,001 entitled "Method and System for Interactively Transmitting Multimedia Information Over a Network Which Requires Reduced Bandwidth" ("the '001 Patent"), United States Patent No. 5,745,379 entitled "Method for the Production and Transmission of Enhanced Multimedia Information" ("the '379 Patent"), and United States Patent No. 5,845,088 entitled "Method for the Production and Transmission of Enhanced Interactive Multimedia Information" ("the '088 Patent"), together with any continuations, continuations-in-part, divisions reissues, or foreign counterparts of the "001, '379 or '088 Patents and any patents issuing from applications whose priority is based upon such patents (collectively "the Lewis Patents").

WHEREAS, Licensor does not know of any rights that Multimedia has that would be violated by the WagerWorks Product and that he has not been advised that there are any such rights at the time of execution of this Agreement.

WHEREAS, Licensee wishes to obtain, and Licensor is willing to grant to Licensee, the non-exclusive, world-wide, personal right to make, use, sell, offer for sale, import and export software products, including WagerWare, that are covered by one or more claims of the Lewis Patents.

NOW, THEREFORE, in consideration of the mutual covenants and promises made herein and for other good and valuable consideration, the parties agree as

1

follows:

## I. DEFINITIONS

A.    LICENSED PATENT RIGHTS -- Shall mean United States Patents Nos. 5,564,001, 5,745,379 and 5,845,088 and any divisions, continuations, continuations-in-part derivatives, reissues or foreign counterparts thereof including copyrightable or copyrighted material and any patents issuing from applications whose priority is based upon such patents as long as those patents are valid and enforceable. Any patent found to be invalid or unenforceable by a court of competent jurisdiction shall be removed from the Licensed Patents Rights.

A.    LICENSED PRODUCTS -- Shall mean multimedia communication technology or software including technology or software for processing or download of multimedia data utilizing various transmissions.  This processing may include enhancement, compression or other forms of data manipulation.  These products specifically include those currently being sold or provided by Licensee for online wagering or gaming systems referred to as the WagerWare product.

B.    NEW USER -- Shall mean any entity who becomes a new registered or unique user of any Licensed Products  after April 30, 2003, or any recipient of such Licensed Products provided or sold by Licensee, either directly or indirectly.

C.    BONA FIDE CUSTOMERS – Shall mean all customers, distributors, dealers, representatives and agents of Licensee and shall include, but not be limited to, Rank Interactive Group, Bonne Terre and MGM, MGM MIRAGE, MGM MIRAGE Online, LLC, third party beneficiaries and all their successors and assigns, their parents, affiliates and/or subsidiaries, predecessors, agents, shareholders, employees, and

2

directors.

## II. **LICENSE GRANT**

A.    Subject to the Royalty payment in Section IV, Licensor hereby grants Licensee a personal, non-exclusive, world-wide, non-transferable right and license under said Licensed Patent Rights to make, use, export, import, offer for sale, and sell, Licensed Products, including the right to sell to Bona Fide Customers for resale and/or use, anywhere in the world.

B.    Licensor agrees that Licensor will not file suit against Licensee or its customers on any patents owned by Licensor with respect to any product, system or software for which a royalty has been paid under this Agreement.  In the event the Licensed Patent Rights are held invalid or unenforceable and/or royalties are otherwise not paid by Licensee as required by this Agreement, then lawsuits or claims under other patents owned by Licensor may be brought anywhere in the world.

C.    The consideration and agreements set forth in this Agreement are in full satisfaction of any and all claims that Licensor may have or compensation to which Licensor may be entitled to resulting from Licensed Patent Rights.

## III. **RELEASE**

Upon the execution of this Agreement and subject only to the royalties specified in Section IV below, Licensor and Licensee shall each take all necessary steps to cause the dismissal, on the merits of all claims made by either of them against the other in the cases entitled *Lewis v. Boss Media, et al.*, Case No. CV-S-03-0208-JCM-PAL.  The parties shall cooperate with respect to the preparation and filing of any stipulation necessary to effect the immediate dismissal of all claims described in this paragraph.  In

3

consideration of the terms of this Agreement and the performance of the obligations, hereunder, the parties hereby release, acquit and discharge each other, their respective members, managers, partners, employees, clients, insurers, attorneys, and successors and/or agents from any and all claims, demands, damages, debts, liabilities, actions, causes of action or suits of whatsoever kind of nature, presently known or unknown, asserted or unasserted, arising out of all claims made in *Lewis v. Boss Media, et. al.*, Case No. CV-S-03-0208-JCM-PAL and all matters that have been asserted by the parties in *Lewis v. Boss Media, et. al.,* Case No. CV-S-03-0208-JCM-PAL against each other.  The parties also agree that all claims, demands, damages, debts, liabilities, actions, causes of action or suits of whatsoever kind of nature, presently known or unknown, asserted or unasserted, that the Licensor may have against MGM MIRAGE and MGM MIRAGE Online, LLC arising out of the Lewis Patents and any of Licensee's products are hereby forever waived and released to the extent such claims are waived and released as to Licensee.  Should Licensee breach Section IV, Licensor shall notify MGM MIRAGE and MGM MIRAGE Online, LLC within fourteen (14) days of its awareness of such breach.  In the event Licensee should breach Section IV, MGM MIRAGE and MGM MIRAGE Online, LLC will be permitted to make reports and payments according to Section IV of this agreement on their own behalf.

With the exception of the royalties specified in Section IV below, the parties agree to bear their own attorney's fees, costs, and expenses incurred in connection with *Lewis v. Boss Media, et. al.*, Case No. CV-S-03-0208-JCM-PAL and the matters resolved through this Agreement.  The Stipulation of Dismissal and the Agreed Order of Dismissal forms are attached to this Agreement and incorporated herein.

4

## IV. ROYALTIES

A.      An initial payment of Twenty Five Thousand Dollars ($25,000.00) payable

in three installments over the next six (6) months shall be made by Licensee as follows:

| | |
|---|---|
| May 30, 2003 | Ten Thousand Dollars ($10,000.00) |
| July 31, 2003 | Ten Thousand Dollars ($10,000.00) |
| September 30, 2003 | Five Thousand Dollars ($5,000.00) |

All such payments shall be made to Licensor through his attorneys, Niro, Scavone,

Haller & Niro and sent by wire transfer to the following client trust account:

> CITIBANK FSB -- Chicago, Illinois
> ADA No. 271070801
> Niro, Scavone, Haller & Niro Client Trust Account
> Account No. 0980023222

B.      An additional royalty obligation beginning on June 30, 2003 will accrue, to

be paid to Licensor through his attorneys quarterly within thirty days of the end of the

applicable quarter as follows:

- One Dollar ($1.00) for each New User of any Licensee-supplied gaming software, up to and including the first One Hundred Thousand (100,000) Users;

- Seventy Five Cents ($0.75) for each New User thereafter up to and including the second One Hundred Thousand (100,000) New Users; and

- Fifty Cents ($0.50) for each New User over Two Hundred Thousand (200,000) New Users.

All such royalty payments shall also be made to Licensor through its attorneys, Niro,

Scavone, Haller & Niro and sent by wire transfer to the following client trust account:

> CITIBANK FSB -- Chicago, Illinois
> ADA No. 271070801
> Niro, Scavone, Haller & Niro Client Trust Account

5

Account No. 0980023222

## V. BOOKS, RECORDS AND PAYMENTS

A.    Licensee shall keep accurate and complete books and records sufficient to determine the quantity of Licensed Products sold or provided and/or New Users to whom Licensed Products, including software, are sold or provided in the United States to the extent necessary to accurately reflect all items material to the determination of the royalty amounts due Licensor under this Agreement.

B.    The books and records of Licensee shall identify the quantity of all Licensed Products and Users.

C.    Within thirty (30) days after the receipt of quarterly subscriber data information from Bona Fide Customers by Licensee, Licensee shall send Licensor a report, in writing, certified by an officer of Licensee as to its correctness, showing separately the quantity of New Users and Licensed Products subject to royalty payments that were sold or otherwise disposed of by Licensee and computing the amount of royalty due Licensor for the preceding quarter. Each such report shall be accompanied by the proper royalty amount then payable to Licensor as shown in such report. The report due for each quarter which coincides with the end of a calendar year or portion of a calendar year in which termination of this Agreement occurs shall also include a statement of the total payments for such year made pursuant to this Agreement.

D.    All such reports, books, records and accounts shall be retained for not less than three (3) years, and shall be open to examination at Licensor's expense at all reasonable times, not more than once per year, by an independent outside certified

6

public accountant ("Accountant") designated by Licensor.

E.    The Accountant shall be subject to the following confidentiality requirements.  Licensor shall have Accountant acknowledge and agree that all books, records and accounts are considered confidential by the Licensee and Bona Fide Customers.  As such, Accountant will hold all Licensee and Bona Fide Customers' books, records and accounts in strict confidence.  The Accountant shall protect all information provided by Licensee and shall not reveal any information with regards to the books, records and accounts to Licensor.  In cases where the Accountant establishes that Licensee's payments to Licensor are deficient by an amount greater than five percent (5%) of the amount actually due, then Accountant may release information specific to the failure only to Licensor to substantiate the Accountant's claim. Information not related to the failure shall remain in strict confidence and may not be released under any circumstances.  These confidentiality requirements shall survive termination of this Agreement.

F.    Licensor is limited to one (1) audit per calendar year, unless it is determined in such audit that Licensee has not complied with the terms of this Agreement, whereby, Licensor may audit Licensee more than once per calendar year until Licensee is in compliance with this Agreement for two (2) consecutive audits.  Licensor shall provide Licensee with fourteen (14) or more days prior written notice, and will conduct the audit during regular business hours.

G.    Any failure by Licensee to keep and maintain such books and records or to provide reports or payments to Licensor as required by this Agreement shall constitute a material breach of this Agreement.

7

H.    In the event an audit of Licensee's books and records by an outside certified public accountant establishes that Licensee's payments to Licensor are deficient by an amount greater than five percent (5%) of the amount actually due Licensor, Licensee shall be required, upon receipt of notice of such deficiency, to pay Licensor one and one-half (1.5) times the amount due, plus interest at the prime rate charged by major New York banks at the time the deficiency is discovered.

## VI. __TERM AND TERMINATION__

A.    This Agreement shall continue in full force and effect, unless sooner terminated as herein provided, with respect to the Licensed Products, until the expiration date of every patent in the Licensed Patent Rights.

B.    Licensor may terminate this Agreement upon written notice to Licensee, if:

1.    Licensee shall become insolvent, or shall make any assignment for the benefit of creditors, or Licensee is adjudicated bankrupt, or a receiver or trustee of the Licensee's properties shall be appointed.

2.    Licensee shall remain in default of any payment or report required hereunder or fail to comply with any other provision of this Agreement for a period of more than thirty (30) days after written notice specifying such default or failure is given Licensee by Licensor.

3.    Licensee shall otherwise continue to violate any term, condition or provision of this Agreement for a period of more than thirty (30) days after written notice specifying such violation is given Licensee by Licensor.

In the event Licensee cures any default within the thirty (30) day time period set forth above, this Agreement shall not be terminated and shall remain in full force and effect.

C.    Termination of this Agreement shall not relieve Licensee of the obligation to make payments accruing under this Agreement prior to termination nor shall it bar Licensor from obtaining any relief to which Licensor may be entitled in law or in equity, including the right to bring suit against Licensee or Bona Fide Customers for infringement of any patent in the Licensed Patent Rights. Licensor agrees that such Termination shall not require Bona Fide Customers to make payments on behalf of Licensee. Sections 1, 7, and 11 will survive any Termination of this Agreement.

## VII. **ASSIGNMENTS**

A.    This Agreement shall inure to the benefit of, and be binding upon, the successors, legal representatives or assigns of Licensor.

B.    This Agreement and the licenses granted hereunder, are personal and shall not be assigned by Licensee to any other business or entity, nor shall it be extended to any third party that purchases any part of Licensee's assets or stock, without the prior written consent of Licensor, which shall not be unreasonably withheld. Notwithstanding the foregoing, a transaction or series of transactions that results in (i) a change in control or a change in the majority ownership of Licensee, including by way of a tender offer, (ii) a sale of all or substantially all of the assets of Licensee, or (iii) a merger or business combination to which Licensee is a party (whether Licensee is the surviving entity or not), will not be deemed an assignment under this Agreement.

## VIII. **MOST FAVORED NATION**

During the term of this Agreement, Licensor will not grant similar rights to any third party (a "Third Party Licensee") at a royalty rate that is more favorable to the Third Party Licensee than the rates to be paid by Licensee. If, during the term of this

Agreement, Licensor offers or grants similar rights to a Third Party Licensee at a rate that is more favorable than the royalty rate to be paid by Licensee (i) Licensor will notify Licensee in writing, and (ii) from the date of the grant of the similar rights, the ROYALTIES section will be automatically amended without further action by either party to reflect the more favorable terms offered to the Third Party Licensee.

## IX. <u>NOTICES</u>

All notices required or permitted by this Agreement shall be in writing and shall be sent by registered mail, postage prepaid, addressed as follows:

Licensor:

> Dr. Scott Lewis
> 540 North Santa Cruz Avenue
> Suite 169
> Los Gatos, California 95030

Licensee:

> Mr. Andrew Pascal
> WagerWorks, Inc.
> 2339 Third Street
> Fourth Floor
> San Francisco, California 94107

MGM MIRAGE:

> Mr. Bryan L. Wright
> MGM MIRAGE
> 3600 Las Vegas Boulevard South
> Las Vegas, Nevada 89109

Any party may change the address to which notices shall be sent to it by notice in writing to the other party.

## X. <u>NON-WARRANTY</u>

A.    Nothing in this Agreement shall be construed as:

10

1.    a warranty or representation by Licensor as to the validity or scope of any patent that has issued from the Licensed Patent rights;

2.    a warranty or representation that making, using or selling of Licensed Products by Licensee will be free from infringement of any patents owned by others than Licensor.

B.    Licensee hereby releases, indemnifies and holds Licensor harmless from any and all product liability claims, actions, losses, damages and liability resulting from or arising out of the use or sale by Licensee of Licensed Products for the duration of this Agreement.

C.    Licensee agrees to indemnify Licensor for all product liability claims, actions, losses, proceedings, damages, liabilities, costs and expenses, including attorneys' fees arising out of, in connection with or resulting from the use or sale of Licensed Products by Licensee.  Licensee will provide Licensor, at least once annually, with a certificate of insurance regarding Licensee's product liability insurance or any other such reasonable proof of Licensee's continuing indemnification that Licensor may require.

D.    Licensor has not made, and does not make, any representation, warranty or covenant, express or implied, with respect to the condition, quality, durability, suitability, fitness for particular purpose or merchantability of Licensed Products. Further, Licensor expressly disclaims any and all warranties, express or implied, regarding the condition, quality, durability, suitability, fitness for particular purpose or merchantability of Licensed Products.

11

## XI. **LIMITATION OF LIABILITY**

NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY INDIRECT

DAMAGES OR FOR ANY SPECIAL, CONSEQUENTIAL, EXEMPLARY OR

INCIDENTAL DAMAGES (INCLUDING LOST PROFITS) ARISING FROM ANY CLAIM

RELATING TO OR ARISING OUT OF THIS AGREEMENT WHETHER THE CLAIM

FOR SUCH DAMAGES IS BASED ON WARRANTY, CONTRACT, TORT (INCLUDING

NEGLIGENCE OR STRICT LIABILITY, BUT EXCLUDING GROSS NEGLIGENCE OR

RECKLESSNESS) OR OTHERWISE, EVEN IF AN AUTHORIZED REPRESENTATIVE

OF LICENSOR IS ADVISED OF THE POSSIBILITY OR LIKELIHOOD OF THE SAME.

## XII. **EFFECTIVE DATE**

This Agreement shall become effective and binding upon the parties hereto on

the date first above written.

IN WITNESS WHEREOF, the parties hereto have caused to be signed by their

duly authorized officers, this Agreement at the places and on the dates set forth below.

SCOTT LEWIS

Dated: 5/13/03 _____

WAGERWORKS, INC.

Dated: 5/13/03   By: _____

Its: _PRESIDENT & CEO_

MGM MIRAGE, MGM MIRAGE Online, LLC with regards to Sections I, III, V, VI, and IX

Dated: 5/16/03   By: _____

Its: VP - Asst. Gen Counsel of MGM MIRAGE

Asst. Secretary of MGM MIRAGE Online, LLC

12

# EXHIBIT D

**aAlexa**®



Daily Reach (percent)
bodog.com

©2007 Alexa                                    2007 Mar 14

**Reach for Bodog.com:**
Percent of global Internet users who visit this site

| Yesterday | 1 wk. Avg. | 3 mos. Avg. | 3 mos. Change |
|---|---|---|---|
| 0.0255% | 0.0205% | 0.02695% | ▼ 19% |

**Traffic Rank for Bodog.com:**
Alexa traffic rank based on a combined measure of page views and users (reach)

| Yesterday | 1 wk. Avg. | 3 mos. Avg. | 3 mos. Change |
|---|---|---|---|
| 5,633 | 6,561 | 4,674 | ▼ 590 |

**Page Views per user for Bodog.com:**
The number of unique pages viewed per user per day for this site

| Yesterday | 1 wk. Avg. | 3 mos. Avg. | 3 mos. Change |
|---|---|---|---|
| 2.3 | 2.7 | 3.0 | ▲ 7% |

## Bodog.com users come from these countries:

United States 66.9%
Canada 8.4%
United Kingdom 3.5%
Sweden 2.1%
Costa Rica 1.9%

# EXHIBIT E



The World's Billionaires

# Catch Me If You Can

Matthew Miller 03.27.06

### Calvin Ayre has gotten very rich by taking illegal bets over the Internet.

On a warm, bright morning just outside San José, Costa Rica, Calvin Ayre, slightly hungover, was lounging in his bathrobe at a poolside office in his new $3.5 million, 10,000-square-foot compound. Sipping coffee poured by one of his five servants, the entrepreneur declared, paraphrasing Sun Tzu's *The Art of War*, "I'm going to win this war without fighting battles. I've put a lot of energy into finding ways not to fight my enemies."

From this tropical oasis, Ayre has dodged and taunted those enemies, the main one being the U.S. Department of Justice. His Bodog Entertainment Group is in the not very kosher business of Web gambling. It takes bets from 16 million customers, most of them in the U.S. And that appears to violate the law--Title 18, Section 1084 of the U.S. Code--which forbids using telephones or other communication devices "in interstate or foreign commerce" in order to take bets. "Online gambling, whether it is located offshore or not, is illegal when it comes to the United States and its citizens," says a Justice Department official who works on Internet gambling crimes.

But Bodog has no physical presence in the U.S., Ayre is not an American citizen, and the extraterritorial reach of U.S. law is not clear. Ayre, at any rate, has no assets in the U.S. for the G-men to seize.

Last year the privately held Bodog handled $7.3 billion in online wagers, triple the volume of 2004. Ayre says all this betting gave him sales of $210 million, and that he took 26% of the revenue to the bottom line. What's his business worth? Two similar ventures that are publicly traded (in Europe) go for well over 18 times trailing earnings. At that multiple, Bodog, along with other assets, gives Ayre a net worth of at least $1 billion.

Ayre presumably has not just the vice squad but the tax collectors in a huff. While 95% of his sales come from the U.S., the 44-year-old doesn't pay a nickel in corporate or personal income tax here. Is that legit? Foreigners are supposed to pay federal tax on income derived from U.S. business activities. The suckers are stateside, the electronic roulette wheels and digitized sports pools in Costa Rica. Where's the action? It remains to be seen whether irs agents could make Ayre pay, assuming they could get their mitts on either him or his money.

His taunting analysis of the law: "We run a business that can't actually be described as gambling in each country we operate in. But when you add it all together, it's Internet gambling."

There are 2,400 Internet gaming sites, estimates tracker Casino City, a few hundred of them operating in Costa Rica's tax and regulatory haven. According to research company Christiansen Capital Advisors, they pulled in revenue (vigorish, that is) of $12 billion last year, double the volume on the Las Vegas Strip. Ayre gets his share with a smorgasbord of offerings (sports, poker and casino games), a heavy dose of marketing and a lot of repeat business. Bodog.com claims 145,000 regulars who bet at least once a week. Their average wager: $60 for sports, $13 for casino games.

Bodog is spending $80 million this year to nudge beyond gaming into a kind of MySpace for adults. Most of it is pretty cheesy entertainment, like his recent hosting of the Lingerie Bowl, a raunchy pay-per-view cable alternative to the Super Bowl halftime show. Ayre is also supporting the careers of a dozen lesser-known rock and hip-hop acts (Bif Naked and Syndicated Villain among them) and producing a poker show on cable TV with a slew of C-list celebrities like Rob Mariano (a contestant on CBS' *Survivor*) and card shark David Williams. Hardly any of these ventures makes money, though Ayre insists they will one day. But it probably lures customers to try their luck on Bodog.com. Its 1.5 million unique visitors per month, according to Internet tracker Hitwise, rivals that of Sportsbook.com, which is owned by London Stock Exchange-traded Sportingbet Group, the world's largest sports betting company.

Ayre likes to be seen--especially with attractive women. He is unmarried and has no steady girlfriend ("It would be unfair to the girl," he says). He has himself driven around in a black Hummer by a chauffeur who was trained as a sniper in the Canadian military and practiced in Somalia, Bosnia, Afghanistan and Iraq. Why the heavy metal? Ayre says he and three friends were robbed at gunpoint on the streets of San José a few years ago. His rivals say there's about as much need for a bodyguard in Costa Rica as in Boca Raton.

Raised in Lloydminster, Sask., Calvin Edward Ayre (pronounced "air") is the son of grain and pig farmers. He placed his first bet during his teens, playing blackjack for pennies with his mates on long hockey trips across the Canadian tundra. By the time he attended the University of Waterloo, Ayre was betting on sports (for beers, he says), and developing a taste for business. Over the summer he bought a five-ton truck, loaded it with cherries and peaches he'd picked and sold the fruit to motorists on the side of the road. He also organized trips to Florida and Cuba for his party-going classmates.

It didn't take him long to land in trouble. With an M.B.A. from City University in Seattle, Ayre took a job in June 1990 as president of Bicer Medical Systems, a Vancouver, B.C. heart-valve maker. The company was underfinanced, he says. According to British Columbia Securities Commission documents, Ayre sold 300,000 Bicer shares without releasing a prospectus. He also moved millions of shares between several accounts, including his own, without filing insider trading reports. "I knew that I wasn't following all the rules," he says. "But I also knew I had to do it to keep the budget alive." Though he was never charged, Ayre settled in 1996 for a $10,000 fine and a 20-year prohibition from running a company listed on the Vancouver Exchange.

Meantime Ayre borrowed Cisco training manuals and taught himself network design, then tried launching several Web-based ventures, including a voice-over-IP company. All of them flopped. Then he read a newspaper story about Ronald (the Cigar) Sacco, a U.S. bookie who had set up an offshore phone-in betting operation in the Dominican Republic to elude felony charges in the States. "There was a loud bang in my head and the whole universe came together," Ayre recalls. (Sacco pleaded guilty in 1994 to money-laundering charges and went to prison a year later. His operation later moved to Costa Rica.) Ayre invested $10,000 to build a Web-based system for betting online, providing software to offshore bookmakers.

By 1996 he was in Costa Rica, helping to launch some of the first online casinos, like WinSports and GrandPrix, for other bookmakers. Internet gambling was basically unheard-of, and there was a strong disconnect between the kid and the old coots taking the bets. Ayre not only wanted to encourage smaller bets to generate more predictable revenue and profits, he also wanted to settle accounts with online checks, instead of suitcases of cash. "I was pioneering a new industry," he says. That's half true. Sportsbook.com was championing a similar model, taking bets from customers using credit cards issued by European banks.

Ayre launched his own site in April 2000, starting with sports betting. There were options to pay with credit cards and online checks (wired from U.S. accounts to Bodog's London accounts), a $5,000 maximum and plenty of pictures of pretty girls. Later he added online poker and casino games. In the event that you are a winner, you collect via wire transfer. Presumably, you declare your winnings on your 1040, but Ayre does not file reports with the IRS.

---

To create some attention, Ayre begat the fictitious "Cole Turner" as the public face of Bodog. He convinced Christopher Costigan, owner of Gambling911, an online tabloid promoting Web gambling, to post stories of Turner, an Indiana Jones-like character. In 2003, for example, Ayre turned his vacation to Thailand into a Cole Turner Internet adventure. Using a digital camera, a machete, fake blood and a cast of taxi drivers and massage-parlor girls, Ayre spun the tale of Turner leading an expedition into Cambodia to fight a cell of Buddhist terrorists. Along the way Turner was captured by the Cambodian army, double-crossed by opium warlords in a lost ancient city and wounded in a knife duel while escaping the country. Ayre wrote the eight-story series on the plane back to Costa Rica. It was released during the college bowl season.

The series got noticed. Disgusted bookies at rival companies posted notes on Internet forums saying Turner was a terrible businessman because he was off on an adventure rather than at his desk during one of the busiest betting times of the year. One gambler called Bodog and said he wouldn't place another bet until he knew if Turner was alive.

But the joke got old. After being quoted in a 2004 *Cigar Aficionado* magazine story as Cole Turner, Ayre got tired of explaining to reporters that Turner was just a marketing trick. Still Ayre hasn't lost his crude touch: He sometimes hands out thong underwear as business cards. For an April Fool's gag last year he released a statement apologizing to customers for losing Bodog to Virgin's Richard Branson in a drunken poker match.

Bodog is based in Costa Rica, where 150 bookmakers and customer service reps guide the action. The government doesn't charge businesses on money earned from other countries, and since Ayre doesn't take bets from Costa Ricans, all Bodog revenues come from foreign lands. He pays no personal income taxes in Costa Rica since all his assets--cash, cars, houses and other properties--are in Bodog's name, not Ayre's. He says he has $25 million invested in Costa Rican and Canadian real estate and $40 million in Swiss banks.

In Vancouver, 200 graphic designers and computer programmers work at Riptown Media, whose only client is Bodog. But producing advertising copy is not a crime and Bodog itself doesn't keep an office in Canada, which has legal restrictions against online gambling similar to those in the U.S. Ayre says his citizenship isn't a reason for not setting up operations in Canada, though he still carries that insider trading settlement on his record and admits he doesn't want to "tempt fate."

The U.S. Justice Department hasn't had much luck prosecuting online gambling operators. Jay Cohen, an American who co-owned World Sports Exchange in Antigua, is the only known proprietor ever put on trial. Found guilty of accepting bets from America over the Internet in August 2000, he was sentenced to 21 months. But some American offshore operators haven't been touched, even though they sometimes return to the States. Among them: Ruth Parasol and J. Russell DeLeon, a married couple who, along with Indian partner Anurag Dikshit, got very rich when they took PartyGaming, a Gibraltar company, public in London last June. Dikshit is worth $3.3 billion, Parasol and DeLeon $1.8 billion each.

Uncle Sam has found ways to make those who help Web casinos sweat. In 2003 Ebay's PayPal operation paid the U.S. $10 million to settle charges of enabling online betting with money

transfers. In January the tabloid *Sporting News* surrendered $7.2 million to the government, money it earned advertising gambling sites. Ayre has a clever work-around. Most broadcasters in the U.S. don't want to pay fines for running Bodog.com ads but happily take money for advertising Bodog.net, a free "educational" site that looks almost identical to the Bodog.com money machine.

There is some risk that Congress will give the DOJ more weapons with which to attack offshore gamers. Senator Jon Kyl (R--Ariz.) has introduced a handful of bills to stop online gambling. One made it to the floor and was voted down in November 1999; Kyl's handler blames "shadowy forces." Rep. James Leach (R--Iowa) introduced similar legislation last November. "Internet gambling has dangerous implications for families and society," Leach says. "It's also a front for money laundering and terrorism," though he has only anecdotal evidence.

Ayre, paradoxically, might also be in trouble if Congress went the other way and legalized online gambling. That, he says, would encourage the likes of Google, Microsoft and Ebay to open sites. But other powers disagree. "Do you think the Internet or gambling is going to disappear in the next ten years?" asks Nigel Payne, Sportingbet's chief, who spends much of his time lobbying for regulation. (His largest stockholders include Fidelity Investments and Merrill Lynch.) "The U.S. needs to regulate it, license it and tax it." Payne says the U.S. government could have reaped $900 million from online gambling taxes last year. He has a strong ally in Terri Lanni, chief executive of MGM Mirage, which owns the Bellagio and MGM Grand in Las Vegas. Washington is "making a major mistake by not legalizing this type of gambling, considering that almost all wagers going to offshore sites come from the United States," he says.

Whatever happens, Ayre will try to make sport of it. "One of the things that drives me is the excitement that I could fail," he says. "What better buzz can you get?"