# EXHIBIT 8

- Law.com Home  • Newswire  • LawJobs  • CLE Center  • Online Store  • Our Sites  • Advertise

# LAW.COM
First in Legal News and Information

Register for Legal Newswires | Legal Blogs | Newsletters | XML Feeds

## Meet the Original Patent Troll

Attorney and 26-lawyer firm sue first, settle fast and collect big. But can that last, in the face of imitators and enemies?

Lisa Lerer
IP Law & Business
July 20, 2006

Printer-friendly    Email this Article    Reprints & Permissions



Patent attorney
Raymond Niro Sr.

Raymond Niro rarely looks for clients anymore. Instead, the charming, Chicago-based litigator hunts for patents. This unconventional strategy has made him rich and, in some circles anyway, infamous.

The Niro (rhymes with Cairo) technique works like this: In early 2001, he learned that Schneider Automation, Inc., was selling a patent covering the use of spreadsheet programs in manufacturing equipment. The North Andover, Mass.-based company invited hundreds of companies to bid on the patent. No one was interested -- except for Niro.

Niro suspected that Schneider's patent could be his next golden ticket, but he was worried that suing over a patent he owned was unethical. So he kept his wallet closed and opened his Rolodex, calling up former clients to tell them about the patent and offering his legal representation on contingency. His pitch piqued the interest of Daniel Henderson. In the late 1990s, Henderson and Niro sued over 40 companies for infringing patents on early answering machine technology, which Henderson purchased from a Japanese inventor. The litigation brought in $65 million in licensing fees from corporate giants like AT&T, IBM, Sony and Dell.

In March 2001, Henderson "won" Schneider's patent auction -- he was the only bidder -- under the name Solaia Technology LLC, a company formed to hold the patents. Niro's 26-partner law firm, Niro, Scavone, Haller and Niro, took on Solaia's legal work in exchange for a percentage of the licensing profits. A few months later, Niro sent hundreds of nearly identical letters to allegedly infringing companies offering to "amicably and promptly resolve all issues" for a payment of $600,000 to $1 million.

### Legal Technology
Exchanging Your Old Outlook for the New

### In-House Counsel
Another Nail in the Pretexting Coffin

### Small Firm Business
Law Firms Are Priced Out of San Francisco Bay Area Views

ADVERTISEMENT



LEGAL INDUSTRY OUTSOURCING FORUM
FOR BOTH WORK PRODUCT AND SUPPORT SERVICES

October 4, 2007
Marines Memorial Club & Hotel ■ San Francisco, CA

Call 646.520.4934 ■ Email: register@almevents.com
www.almevents.com

The Definitive MANAGEMENT SERIES
ALMEVENTS

"While litigation can result in enormous recoveries after trial, as it has for many of our clients, the costs and burdens involved to both sides in many lawsuits are considerable," wrote Niro.

When the letters didn't get an immediate response, Niro sued 50 companies for patent infringement. Most of the defendants, major companies like Boeing, Clorox and BMW, settled immediately. Solaia took in about $30 million in fees, and Niro's firm got about 30 percent, roughly $10 million.

This is how Raymond Niro rolls. Niro's spent a good portion of his career representing small patent holders like Solaia on contingency -- making millions and igniting a firestorm of controversy. Niro's firm filed 37 patent cases for plaintiff patent holders in 2005, the most of the more than 200 firms surveyed by IP Law & Business. The number was high enough to land Niro Scavone in fifth place on the overall list of firms, tying with such powerhouses as Kirkland & Ellis and Howrey.

Niro's former partner Gerald Hosier found fame and fortune turning Jerome Lemelson's patents on bar code technology into a billion-dollar licensing business. But Niro taught the patent world a more enduring lesson: Lemelson isn't unique. Like an irritating mosquito that GCs can't squash, Hosier's licensing approach could be applied over and over again, on different patents across different industries for huge profits. Niro has extracted royalties on everything from patents covering hemodialysis catheters to wireless technology used to locate items of interest in online maps. In the process, he's made some serious royalties of his own: a Falcon 10 jet, six Ferraris, acres of land in Chicago, Boca Raton and Aspen, and a $250,000 gift to DePaul University endowing the Raymond P. Niro professorship in intellectual property law.

Niro also holds the dubious distinction of being the first patent troll. In 2001 Intel Corporation assistant general counsel Peter Detkin coined the term to characterize Niro and his client TechSearch LLC when Intel was defending a patent suit against them. "Troll was a derivative of, er, me," says Niro. "I'm the first." He's hardly the last: Niro and his millions have inspired waves of impersonators.

Imitation may be the sincerest form of flattery, but it has complicated Niro's business model. Over the past decade, some corporations have grown tired of paying licensing fees to patent holders without products. They've started lobbying Congress to change the patent laws. The issue has become so hotly debated that in May the U.S. Supreme Court weighed in, finding that MercExchange LLC, a patent-holding company, wasn't automatically entitled to an injunction against eBay Inc. -- even though the online auctioneer was found to be infringing MercExchange's patent.

Companies have also started fighting back in court, occasionally funding expensive and vicious legal battles against Niro's clients and other patent-holding companies.

That's what happened in the Solaia case. For Rockwell Automation Inc., a competitor of Schneider, Niro's Solaia letters were a call to arms. Rockwell had been invited to bid in Schneider's auction, but the company declined, believing that the patents covered outdated technology. The company was incensed at the idea of paying Solaia for a "worthless" patent. Worse, Solaia had also sued Rockwell's customers. "We weren't going to roll over and let our customers be subject to the attacks," says Rockwell's IP counsel John Miller. "We wanted to get a public victory in this matter and show that this claim had no merit whatsoever."

On January 21, 2003, Rockwell sued Schneider, Solaia, and Niro Scavone, alleging that by conspiring to hurt Rockwell, the defendants engaged in unfair competition in violation of antitrust laws. In its complaint, Rockwell claimed that Niro masterminded Schneider's auction. Two months after Solaia "won" the fake auction, says the complaint, Niro and Henderson legally formed Solaia as a platform to issue "baseless" patent litigation against Rockwell's customers.

Ads by Google

**Hague Service Convention**
Serve Int'l Defendants Fast. $350 32 years Experience 800-232-8854
www.hagueservice.net

Advertise on this site

Niro hit back, accusing not just Rockwell but also its then chief IP counsel James O'Shaughnessy and its law firms, Fish & Richardson and Howrey of monopslizing -- creating a buyer's side monopoly to prevent Solaia from licensing its patents. The case turned vicious; in court filings, Niro alleged that O'Shaughnessy threatened Solaia in a meeting with Howrey, saying, "It's not personal, it's only business," a line famously uttered by Michael Corleone in "The Godfather."

A Wisconsin district court later dismissed Niro's charges against the law firms and O'Shaughnessy, but the infringement claims continued, stretching the docket sheet to nearly 700 papers. By mid-2006, a series of unfavorable decisions on the merits of the patent forced Niro to drop his claims. Still, Rockwell's victory rang a bit hollow. Solaia's patent was dead, but Henderson and Niro had already collected their paychecks.

The Solaia litigation is over, but the allegation that Niro Scavone invests in its clients lingers. (Intel made a similar charge in the TechSearch case.) Niro flatly and quickly denies that he owns any part of any patents. "It's a rumor that has been generated by our adversaries to discredit Ray," says Anthony Brown, former president of TechSearch, now part of Acacia Research Corporation, "It's not true; it never has been."

But there's no doubt that Niro Scavone is at the center of a patent ecosystem, connecting patent-holding companies, lawyers and inventors, and making serious profits. Longtime client J. Carl Cooper came to Niro's firm through such an arrangement. When Hewlett-Packard filed a declaratory judgment action to invalidate one of the Nevada-based inventor's patents on image resolution enhancement, TechSearch's Brown recommended that he call Niro. Says Cooper: "We ended up with a nice business arrangement where [Brown] made a substantial investment in us, and Ray [Niro] took over the defense in the HP case." HP settled, and Niro went on to assert Cooper's patents against Dell, Sony, LG Electronics, Thomson Financial and many others, netting over $50 million. Cooper used the money to invest in his five-person business, which now, he says, does a lot of lucrative licensing, almost entirely represented by Niro.

A recent sanction from the U.S. Court of Appeals for the Federal Circuit also hangs over the firm's head. In March 2005, the Federal Circuit slammed Niro Scavone lawyers Patrick Solon and Thomas Scavone for their conduct representing Schreiber Foods, Inc., in a patent trial over cheese-processing patents. Niro Scavone had won a $26 million verdict in that case. During the litigation, Schreiber Foods, transferred its patent into a tax shelter, called Schreiber Technologies, Inc., without alerting the court to the change. According to the Federal Circuit's opinion, Solon and Scavone committed "serious misconduct" by concealing evidence of the transfer from the court. The appeals court reversed Schreiber's trial win, and Niro Scavone waived its claim to the damages -- not a hard sacrifice, considering that the case made the firm $30 million in licensing fees. "We made a strategic decision that turned out to be wrong," says Niro, "[The technology has] been licensed and ultimately been successful."

Sitting in his 46th-floor corner office overlooking Lake Michigan, Niro explains why he doesn't fear the anti-troll crusade. The stocky, 6-foot-2-inch lawyer grabs a statue of a troll lying on its back rolling with laughter, displaying it on his huge palm. "There are people out there who say, 'They are terrible people, they are trolls,'" he says. "There isn't one of them -- or at least not a lot of them -- that have ever had the thrill of doing something for a person, a real person, that changed their lives."

For small inventors, Niro is a guardian angel. Inventor Frank Calabrese turned to Niro after he discovered that Square D Company, a $7 billion division of the French conglomerate Schneider Electric SA, was using his data relay system in large manufacturing machines. By the time the case went to trial, the 58-year-old Calabrese was dying of colon cancer and was too sick to take Niro's jet to Chicago for the hearing. Calabrese's last wish, says his wife, Kathy, was to get credit and compensation for his work. Niro made that happen, winning Calabrese $13.2 million (later increased to $20 million by the judge) in January 2000. Two weeks after the jury verdict, Calabrese died. "Every time I do something I think, 'Well, I'm living our dream, Frank,'" says Kathy. "I will always be grateful to Ray Niro and his firm."

Niro wasn't always on the side of the little guy. In 1969, after graduating The George Washington University Law School, he joined Hume, Clement, Hume & Lee (which later became IP law firm Brinks Hofer Gilson & Lione) and soon became a partner representing

large corporations in patent cases. Then Niro's life took its fateful turn: He befriended Hume Clement partner Gerald Hosier.

At Brinks Hofer, Hosier and Niro made $50,000 a year. On their own, they estimated, they could triple that. At the time it seemed like a fortune to Niro, the son of a bricklayer who immigrated from Italy. "If someone would guarantee me [a salary of $150,000] adjusted for inflation for the rest my life, I'd take it," Hosier remembers telling Niro in 1976. "Thank God no one was there to take me up on the offer," says Hosier.

In 1976 Niro and Hosier left Brinks Hofer to start their own firm. They rented a small office on a cheap part of LaSalle Street in Chicago for $600 a month. It was a family affair: Hosier's dad managed the firm's finances, and Niro's elementary-school-aged children played paralegal, running off photocopies and organizing documents. At first, their fledgling firm focused on hourly work, mostly for two clients they'd brought from Brinks Hofer -- B & J Manufacturing and United Shoe Machinery Corp. The first contingency case came within the year: Niro and Hosier represented inventor George Richards in a patent case against EmCo, Ltd., winning $200,000 in damages -- half went to the firm ($50,000 for each lawyer) and half to Richards. Their success convinced Thomas Scavone, another Brinks Hofer lawyer, to jump ship.

By 1983, 20 percent of the firm's work was on contingency. Hosier wanted to do these cases full time. Niro, however, was recovering from a heart attack and feared the risk inherent in a full-on contingency model. So the two fathers of patent contingency litigation split up.

A series of contingency cases in the mid-1990s grew the firm, as Niro brought in more lawyers to handle the increased workload. In 1996 Niro's firm won four patent cases: $48.7 million for a soy-based ink invented by Iowa school teacher Sharon Brower, $5.9 million in two cases for longtime client Black & Decker's SnakeLight flashlight and $2.3 million for a spinal correction device by orthopedic surgeon Dr. David Spencer. Niro Scavone kept up the wins the following year, picking up the (later overturned) $26.2 million Schreiber Foods verdict and, a few months later, $57 million for Injection Research Specialists Inc., in a Colorado trade secrets case over an electronic fuel injection system for snowmobiles. Winnings from those two years alone topped $140 million.

Since that hot streak in the 1990s, however, Niro's wins have grown smaller. Of the recent damage awards, none top $20 million. But as Niro says: "It's not who you are -- it's who people think you are." Niro's reputation as an aggressive litigator brings in the settlements. He happily shows off the statues of the Looney Toons character Yosemite Sam in his office, given to him by his sons for being "quick on the trigger." As Niro's wife explains: "He just takes those guns out of his holster and fires in any direction, then he puts them back and thinks, 'Well, maybe that wasn't such a good idea.'"

That itchy trigger finger typically hits its target: Most trial-shy GCs will settle to avoid litigation. "Ray's business is to settle cases," says Kirkland & Ellis' David Callahan, who represented Hershey and International Paper, two settling parties in the Solaia case. "The primary driver [in settling] was comparing the cost of settlement for what it would cost to litigate successfully."

The cost equation works both ways: A trial costs Niro more than writing a threatening letter; the risk is higher too. And with hundreds of letters, a few hundred-thousand-dollar settlements quickly become millions. In 2000 Niro represented IMS Technology Inc. on behalf of a patent over interactive machine tool control. By the time the jury awarded $8.9 million in damages, other companies had paid out $50 million in settlements. In the TechSearch case, Niro picked up a few million before losing to Intel at the Federal Circuit.

On average, it costs Niro $1 million to put on a case. He doesn't pay expenses, leaving inventors to find other sources, like patent-holding companies or private equity shops to front those costs -- usually about $2.5 million -- in exchange for a cut of the profits. He makes the money either as a straight 30-40 percent of damages, licensing fees and royalties, or a graduated arrangement, where as the firm progresses through the litigation, it gets a bigger cut. For example, for pretrial settlement Niro gets 20 percent; for a verdict at trial, 30 percent; for an appeal, 40 percent. Niro also does contingency work for a few corporations, which pay an up-front fee and a small percentage of the postsettlement riches. Contingency cases produce about 95 percent of the firm's roughly $100 million annual revenue. Niro charges his small number of hourly clients, including Alcatel, AccuMed Inc., Illinois Tool Works Inc. and Black & Decker, an hourly rate of $840.

Love him or hate him, Niro's methods have become ingrained in the patent world. Over the 10 years, more firms have gotten into the IP contingency market, including some bold-faced names like Fish & Richardson and Fulbright & Jaworski. NTP Incorporated, the plaintiff in the highly publicized BlackBerry case, was represented on contingency by Wiley Rein & Fielding (a great decision, considering the firm's $612.5 million payday). The market can't sustain everyone, says Ronald Schutz, a partner at Robins, Kaplan, Miller & Ciresi, which started doing IP contingency cases in the mid-1990s and has picked up some former Niro clients. With 250 lawyers, Robins Kaplan's size gives it an advantage: "We can have more cases in the pipeline to finance the litigation," says Schutz.

The contingency gospel is also taking hold among Texas personal injury lawyers inspired by multimillion-dollar patent damage awards. According to Niro, plaintiffs lawyers have been making the pilgrimage to visit him, hoping to learn from the master. Unlike the big firms, those lawyers offer some real competition, says Niro. Both Niro and Hosier say that big law firms can't work efficiently enough to become serious players in the contingency business. But the personal injury lawyers know how to conduct effective contingency cases. Plus, they'll take big loans to advance expenses. "We've lost some cases that we've really wanted to take because of the willingness of other people to pay all the expenses," says Niro. And that kind of stuff, he says, is really shady business.

Subscribe to IP Law & Business

About ALM | About law.com | Customer Support
Privacy Policy | Terms & Conditions

An Incisivemedia company
incisivemedia.com

Copyright 2007 ALM Properties, Inc. All rights reserved.