Mark A. Hutchison (4639)
L. Kristopher Rath (5749)
Hutchison & Steffen, LLC
Peccole Professional Park
10080 Alta Drive, Suite 200
Las Vegas, Nevada 89145
Telephone: (702) 385-2500
Facsimile: (702) 385-2086

Attorneys for Plaintiff
1st TECHNOLOGY LLC

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| 1ST TECHNOLOGY LLC,<br><br>Plaintiff,<br><br>v.<br><br>RATIONAL ENTERPRISES LTDA.,<br>RATIONAL POKER SCHOOL LIMITED,<br>BODOG ENTERTAINMENT GROUP<br>S.A., BODOG.NET, BODOG.COM, and<br>FUTUREBET SYSTEMS LTD.,<br><br>Defendants. | 2:06-cv-01110-RLH-GWF<br><br>**PLAINTIFF 1ST TECHNOLOGY LLC'S REPLY IN SUPPORT OF ITS SECOND MOTION FOR PERMANENT INJUNCTION AGAINST DEFENDANTS BODOG ENTERTAINMENT GROUP, S.A., BODOG.NET, AND BODOG.COM**<br><br>**ON AN ORDER SHORTENING TIME, PURSUANT TO LR 6-1(a)**<br><br>**ORAL ARGUMENT REQUESTED** |

This is not a patent injunction motion. The Bodog Entities' opposition – which is unsupported by a single statement of any Bodog owner or employee – is replete with red herrings and irrelevant conjecture intended to mislead the Court into believing otherwise. Instead of opposing 1st Technology's motion, the Bodog Entities use colorful language ("patent troll"), ironical constitutional arguments, and misplaced jurisdictional assertions to distract and sway the Court. The issues outstanding are far more limited than the Bodog Entities would have the Court believe. Plus, the Bodog Entities lose on their red herrings arguments.

1st Technology already moved the Court to enjoin the Bodog Entities' continuing violation of its patent. The Court has understandably stayed determination of that motion until it decides the Bodog Entities' motion to set aside the default judgment. For several pages the Bodog Entities dwell on the law and requirements of an injunction under United States patent law. The arguments

are misplaced and irrelevant and 1st Technology will not address them herein.

1st Technology's motion seeks injunctive relief preventing the Bodog Entities from continuing asset flight and fraudulent transfers. The Bodog Entities, judgment debtors, have proven themselves eager to remove their assets from the United States. So this motion deals solely with collections on a judgment this Court entered.

Missing from the Bodog Entities' lengthy opposition are denials of their asset flight and or discussion of the law giving this Court authority to enjoin the Bodog Entities from moving their assets overseas. The Bodog Entities' failure to address these points speaks loudly. The fraudulent transfers undoubtably occurred and the Bodog Entities have no defense for it.

Instead, the Bodog Entities point to their self-devised shell game to protect themselves. They claim that because they are now operating under different domain names and have transferred their web traffic overseas, they "do not operate the websites in question." This is, of course, a manipulation of reality that asks the Court to reward evasive conduct. Make no mistake, the same people who controlled Bodog's operations before the fraudulent transfer still control them. The Court should not reward fraudulent transfers and the Bodog Entities' shell game.

Recognizing their fraudulent conduct and their utter lack of defenses, most of the remaining arguments the Bodog Entities make are substantive defenses to 1st Technology's lawsuit. Despite being served process, the Bodog Entities purposefully ignored this lawsuit when it was filed. They missed their opportunity to object to personal jurisdiction and other perceived defects. They could have protested this Court's ability to adjudicate their rights. They could have defended the merits of the action. They did not, primarily because, as their President has repeatedly expressed, they believe that can operate above American law.

For the reasons discussed below and in its motion, 1st Technology respectfully requests that the Court enter an order granting an injunction reversing the Bodog Entities' past fraudulent conveyances and prohibiting future transfers.

///

1. **A Permanent Injunction Should be Entered to Stop the Bodog Entities' Asset Flight**

The Bodog Entities' primary asset is web traffic and the revenues they generate from web users. Until they recently rerouted their customers to foreign servers via the "Bodoglife.com" address, the Bodog Entities' web traffic went through the United States.[1] The rerouting was intended solely to remove their largest asset from the United States to avoid 1st Technology's judgment.

Interestingly, the Bodog Entities do not deny that they seek to evade this Court's judgment. Instead, they say that what they call *"continued rebranding of the Bodog businesses"* happened to coincide with the flight of their business and web traffic overseas. Opposition at 7 (emphasis added). This claim, unfortunately, ignores the Bodog Entities's owner's public statement to the contrary. On "calvinayrelife.com," the Bodog Entities' owner says *"we have not rebranded. Bodog was Bodog before and it's still Bodog . . ."* See printout of "calvinayrelife.com," a true and correct copy of which is attached hereto as exhibit 3, at 4 (emphasis added). The Bodog Entities' single defense to their fradulent transfer - rebranding - is disingenuous and should be rejected.

The true intent of the Bodog Entities' fraudulent transfer is clear. As noted in 1st Technology's motion, the Bodog Entities' owner has bragged that his company's shift to new domain names rendered 1st Technology's judgment a nullity. He says that "[B]odogLife.com is our new permanent domain. BodogLife.com is not registered in the U.S. and is not subject to being claimed by a U.S. (court) . . . In this move . . . 1st Technology have been defeated." See Exhibit H to Exhibit 1 of motion. Bodog owner Calvin Ayre says on his website that "the company [1st Technology is] in court with is not part of the Bodog group anymore, has zero operations and zero assets." See printout of www.calvinayrelife.com/page/3 at 2, a true and correct copy of which is

---

[1] On page 5 of their opposition, the Bodog Entities claim that "NewBodog.com" is registered in Luxembourg. This is false. The "NewBodog.com" domain was registered to "dotRegistrar," a Washington State company. See letter from Dary Enyeart at dotRegistrar to Venkat Balasubramani dated September 13, 2007, at true and correct copy of which is attached hereto as exhibit 1 (noting that dotRegistrar locked "newbodog.com" and similar domain names); see also dotRegistrat "who is" page, a true and correct copy of which is attached hereto as exhibit 2 (noting that "newbodog.com" is "registered thru [sic] DotRegistrar.com.").

- 3 -

attached hereto as exhibit 4. The Bodog Entities' fraudulent transfer had nothing to do with business practices and their owner admitted as much.

Given the Bodog Entities' admission that their actions have been intended to avoid the United States judgment, they have violated the law prohibiting fraudulent transfers. The Court has the authority to prohibit such illegal transfers pursuant to FRCP 69 and NRS 112.210.

Many Federal courts have held injunctions to be appropriate in these circumstances. For example, one held that "even where the ultimate relief sought is money damages, federal courts have found preliminary injunctions appropriate where it has been shown that the defendant 'intended to frustrate any judgment on the merits' by 'transfer[ring its assets] out of the jurisdiction.'" In re Feit & Drexler, Inc., 760 F.2d 406, 416 (2nd Cir. 1985). In Nastro v. D'Onofrio, the Court held that "the possibility [the judgment debtor] could take further action to void [the judgment-creditor's] judgment, and could possibly dissipate his assets beyond the reach of this court, constitutes irreparable harm" sufficient to issue a preliminary injunction. 263 F. Supp. 2d 446, 459-60 (D. Conn. 2003).

In Star Ins. Co. v. Risk Marketing Group, Inc., 2007 WL 2580478, *3 (N.D. Ill. 2007), the judgment creditor moved for injunctive relief "to prevent defendants from disposing of assets or taking other detrimental action, to prevent those individuals and entities who purportedly received fraudulent transfers from defendants from disposing of those amounts and to freeze the assets of those entities and individuals, and to order those entities and individuals to provide plaintiff's counsel with a detailed balance sheet showing their net worth and a list of all the transfers they have made since the entry of judgment." Recognizing that "plaintiff has a valid judgment," and that "defendants engaged in several transactions that appear to have been fraudulent," the Court granted the requested injunction. Id. at *3-4. The Court also ordered that the fraudulently transferred assets be returned to the plaintiff under its "authority in a supplemental proceeding." Id. at *5. Like in Feit, Nastro, and Star Insurance, this Court possesses the authority to bar past and future fraudulent conveyances.

///

- 4 -

The standard for permanent injunctions is well-settled. "A party seeking a permanent injunction in these circumstances must meet a four-factor test, demonstrating: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." Burgess v. Gilman, 475 F.Supp.2d 1051, 1054-55 (D. Nev. 2007). All of these factors are met here.

The Bodog Entities are moving their assets offshore. Nothing will remain in the United States once they have finished; perhaps they have already disposed of almost all of their United States assets.[2] As the Nastro case recognized, the possibility that the Bodog Entities will continue to dissipate their assets and put them out of the Court's reach is irreparable harm. 263 F. Supp. 2d at 459-60. 1st Technology, who already possesses a monetary judgment against the Bodog entities, needs injunctive relief to ensure the judgment will not be rendered moot.

An order reversing the Bodog Entities' fraudulent transfer and prohibiting future asset flight will not harm them. After all, it will merely require the Bodog Entities to return their assets to their pre-fraudulent transfer state. On the other hand, if the Bodog Entities are permitted to continue to fraudulently transfer their assets overseas, 1st Technology's judgment may be rendered worthless.

Finally, the public interest will be served if the Bodog Entities are required to return their assets to the United States. The interests of United States judgment creditors like 1st Technology will be advanced if illegally-operating foreign companies are required to pay the consequences for their actions.[3] Otherwise, such companies will be able to operate illegally in the United States and

---

[2] As discussed below, the Bodog Entities' trademarks apparently remain in the United States.

[3] Numerous federal statutes render the Bodog Entities' activities illegal in the United States. For example, 18 U.S.C. 1952, a racketeering statute, prohibits the use of interstate commerce in "any business enterprise involving gambling". Congress recently enacted a statute entitled "Prohibition of Funding of Unlawful Internet Gambling." 31 U.S.C. 5361 et seq. The new statute prohibits businesses from accepting credit, electronic fund transfer, or the use of other instruments

- 5 -

then will ignore United States courts and judgments to the detriment of United States citizens and entities.

### 2. The Washington State Motion Does Not Strip This Court's Jurisdiction

The Bodog Entities' argument that the pending Washington State motion somehow bars this Court from prohibiting their asset flight is plain wrong. Citing distinguishable cases– such as those dealing with competing criminal prosecutions and water rights– the Bodog Entities insist this Court must relinquish jurisdiction of its judgment pending collections on those judgment. The proposition of law is unsupported.

The Bodog Entities have not cited, and 1st Technology has not located, any cases holding that collections activities in one state deprive the Court issuing the judgment of jurisdiction. Such a rule would make no sense. It would force judgment creditors to abandon collections activities in one jurisdiction while pursuing their debtor in another. That, in turn, would encourage improper asset flight to the detriment of judgment creditors.

The cases the Bodog Entities cite are easily distinguishable. The Younger case involved competing state and federal criminal prosecutions. 401 U.S. 37, 91 S. Ct. 746 (1970). The Supreme Court reversed a federal court injunction that prohibited a district attorney from prosecuting a criminal defendant. Id. The Court recognized a "national policy forbidding federal courts to stay or enjoin pending state court proceedings except under special circumstances." Id. at 41, 749. The case did not address civil enforcement actions, and did not hold that a federal court loses jurisdiction of a case when derivative state court proceedings, such as executions on a judgment, take place in other jurisdictions. The Bodog Entities' citation to Younger is misplaced and no interpretation of it mandates this Court to relinquish jurisdiction of 1st Technology's action against the Bodog Entites.

The Penzoil and Confederated cases are likewise distinguishable. In Penzoil v. Texaco, the Supreme Court considered "whether a federal district court lawfully may enjoin a plaintiff who has

---

for unlawful Internet gambling. The Bodog Entities' activities, and specifically the business they do with United States consumers, is illegal under these and other statutes.

- 6 -

prevailed in a trial in state court from executing the judgment in its favor pending appeal of that judgment to a state appellate court." 481 U.S. 1, 4, 107 S. Ct. 1519 (1987). Here, the Bodog Entities claim that the federal court that issued a judgment against them to relinquish jurisdiction pending collections activities in another state where some of their assets are located, something the Penzoil Court did not address. The Confederated case involved a federal court action challenging a state's right to regulate water use on a Native American reservation. Confederated v. Simonich, 29 F.3d 1398, (9th Cir. 1994). Like Younger, neither of these cases explicitly or implicitly hold that this Court must abstain from entering an injunction concerning its own order.

Actually, the 9th Circuit has explicitly rejected the Bodog Entities' proposition that this Court must relinquish jurisdiction to the Washington State courts. In Duckek v. Jacobi, 646 F.2d 415, 417 (9th Cir. 1981), one party argued that FRCP 69 "may be construed to eliminate a federal court's jurisdiction to enforce judgments when the applicable state procedure facially requires that proceedings be held in a state tribunal." (Here, notably, the Bodog Entities argue that this Court lacks jurisdiction even though no Washington State statute purports to strip the Court of its jurisdiction.) Soundly rejecting the argument, the Duckek court held that FRCP 69 "unmistakably contemplates proceedings in federal court according to state practice and procedure, not jurisdiction in state courts." Id. The court further reiterated that:

> No other interpretation of Federal Rule of Civil Procedure 69(a) has ever prevailed. [R]ule 69(a) is one of procedure and practice, not jurisdiction. ... Nothing ... remotely suggests that a federal court must cede jurisdiction to a state tribunal.

1st Technology sued the Bodog Entities in Nevada because of 1st Technology's contacts with this state. See infra. It initiated a Washington State action to seize the Bodog Entities' Washington State assets. It moved to seize the Bodog Entities' domain names in Washington State because the domain names were housed on servers in that state. It now seeks to prevent the Bodog Entities from asset flight in the Court issuing the underlying judgment. The cases and the pending motions are wholly independent. No grounds exist for this Court to abstain hearing this motion or to relinquish jurisdiction.

- 7 -

### 3. The Court Has Personal Jurisdiction Over the Bodog Entities

The Bodog Entities' late jurisdictional arguments are a red herring and fail under the prevailing law. If the Court upholds the default judgment, the issue of whether the Court had personal jurisdiction over the Bodog Entities will likely be rendered moot. If the Court sets aside the default judgment, 1st Technology will proceed with its lawsuit and will prove that this Court has jurisdiction over the Bodog Entities. For now, a brief discussion of 1st Technology's service on the Bodog Entities' and the Bodog Entities' contacts with Nevada is appropriate.

The Bodog Entities' lack of service arguments are simply false. As discussed in 1st Technology's opposition to the Bodog Entities' motion to set aside default judgment, service was properly effectuated on the Bodog Entities. The Bodog Entities' continue to disingenuously claim that service was improper, but the Court should reject that argument in light of the evidence to the contrary.

As explained in the attached supplemental declaration of Alan Hernandez Vargas, 1st Techology's process server, the summons and complaint were hand-delivered to the Bodog Entertainment Group, S.A.'s corporate offices on November 23, 2006. See supplemental declaration of Alan Vargas, a true and correct copy of which is attached hereto as exhibit 5. When Mr. Vargas approached the Bodog Entities' offices, he asked to speak to the person who was in charge. Id. Mr. Vargas was directed to Ms. Victoria Mora. Id. Had Ms. Mora not identified herself by name, Mr. Vargas would not have know who she was. Id. Mr. Vargas handed the summons and complaint to Ms. Mora and asked her to sign a receipt and acknowledgment of them. Id. Ms. Vargas unfortunately refused to accept service. Id. Mr. Hernandez created a "record" for the situation, as is required under Costa Rican law. Id. This constitutes proper service under Costa Rican law. Id.

The Bodog Entities are now claiming that they were not operating in Costa Rica when they were served process on November 23, 2006. This is untrue. As noted in the attached declaration of Mauricio Bonilla Robert, the Bodog Entities announced that they planned to transfer their "Bets Division" away from Costa Rica in December 2006. See declaration, attached hereto as exhibit

- 8 -

1  6. Exhibit A to exhibit 6 (which is translated in exhibit B to exhibit 6) indicate that some of the Bodog Entities' operations were to remain in Costa Rica after the transfer. Regardless, the November 23, 2006 service of the summons and complaint occurred before the Bodog Entities transferred some of their operations overseas. Id.

Because 1st Technology properly served the Bodog Entities, the remaining issue is whether this Court has personal jurisdiction over them. The Court unquestionably has such jurisdiction. The standard for personal jurisdiction is well-established in this jurisdiction.

> Due process requires that the defendant has minimum contacts with the forum such that the maintenance of the suit will not offend "traditional notions of fair play and substantial justice." By applying the minimum contacts analysis, a court may obtain either specific or general jurisdiction over the defendant.

Zuffa, LLC v. Showtime Networks, Inc., 2007 WL 2406812, *2 (D. Nev. 2007) (internal citations omitted). Jurisdiction over a defendant can be either general or specific.

> The exercise of general jurisdiction is appropriate only where the defendant's activities in the forum state are so "substantial" or "continuous and systematic," that it "approximates physical presence" in that state. This is an exacting standard because a finding of general jurisdiction permits a defendant to be haled into court in the forum state to answer for any of its activities anywhere in the world. In determining whether to exercise general jurisdiction, the court should consider "whether the defendant makes sales, solicits or engages in business in the state, serves the state's markets, designates an agent for service of process, holds a license, or is incorporated there." The court should also focus upon the "economic reality" of the defendant's activities rather than a mechanical checklist.

Id. (internal citations omitted.) "Even if substantial, or continuous and systematic contacts exist, the assertion of general jurisdiction must be reasonable. Id. at *3.

If a defendant is not subject to a forum's general jurisdiction's jurisdiction, it may be hailed in to a Court with specific jurisdiction over it.

> Absent general jurisdiction, specific personal jurisdiction over a defendant may be established only where the cause of action arises from the defendant's contacts with the forum." To determine if the exercise of specific jurisdiction is proper over a defendant, the Ninth Circuit uses the following three-part test:
>
> 1) the nonresident defendant must purposefully direct his activities or consummate some transaction with the forum or residents thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and

- 9 -

    protections of its laws;

    2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and

    3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

    A plaintiff need only satisfy the first two prongs of the test. "If the plaintiff fails to satisfy either of these prongs, personal jurisdiction is not established in the forum state." If, however, "the plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable."

Id. at *7-8 (internal citations omitted).

    The Bodog Entities have continuous and sustained contacts with Nevada and its residents sufficient for this Court to establish general jurisdiction over them. As a preliminary matter, Nevada residents transact business on the Bodog Entities' websites. Nevada customers download information from the Bodog Entities' websites daily.

    Aside from these daily contacts, the Bodog Entities have frequently held, attended, and sponsored events and individuals in Nevada. For example, the Bodog Entities held "marketing" conferences in Nevada in 2004 and 2005 and planned to hold another one in 2006. See Bodog.com marketing conference press release dated June 1, 2005, a true and correct copy of which is attached hereto as exhibit 7 (noting that the 2004 Bodog.com Conference was "an overwhelming success" and scheduling the 2005 conference at Mandalay Bay in Las Vegas); see also July 21, 2006 press release, http://www.prwebdirect.com/releases/2006/7/prweb414427.php, a true and correct copy of which is attached hereto as exhibit 8 (noting that Bodog "postponed" the 2006 conference because of "high level of concern over the uncertainty surrounding the U.S. government's recent actions against a company in our industry." The article notes that the conference would instead take place "at an international location.")

    The Bodog Entities operated at least one Nevada corporation until very recently. Until its status was revoked on September 1, 2007, "Bodog Music, Ltd." was incorporated in Nevada. See Nevada Secretary of State printout, a true and correct copy of which is attached hereto as exhibit

9. Bodog Music, Ltd. was incorporated in Nevada for five years before its status was revoked on September 1, 2007. Id.

The Bodog Entities sponsor the World Series of Poker, which occurs in Nevada. See Pokerlisting.com Home Page, which contains Bodog's $40,000.00 World Series of Poker "freeroll" and links to Bodog.com's website, a true and correct copy of which is attached hereto as exhibit 10. In fact, Bodog has sponsored a "team" of players in the last two World Series of Poker. See "Bodog WSOP Las Vegas Sponsorships" page, a true and correct copy of which is attached hereto as exhibit 11 (noting that Bodog was represented by "over 500" players at the 2006 World Series of Poker); see also Bodoglife report on Bodog players at the 2007 World Series of Poker, a true and correct copy of which is attached hereto as exhibit 12; see also press release dated August 10, 2006, a true and correct copy of which is attached hereto as exhibit 13 (noting that for the 2006 World Series of Poker, "Bodog.com, the most recognizable brand in online gambling and entertainment, is sponsoring several celebrity poker aficionados." In the press release, the Bodog Entities' owner Calvin Ayre says "with over 400 WSOP Main Event Seats . . . Team Bodog will be a force that's sure to dominate the tables."); see also December 7, 2005 article from "BodogNation" entitled "Good Morning, Kido Pham," a true and correct copy of which is attached hereto as exhibit 14 (describing "Team Bodog" player Than Pham's victory at an event a Paris Las Vegas Casino.).

The Bodog Entities also engage in a "Affiliate Agreement" with Nevada residents and businesses. See Affiliate Agreement, attached hereto as exhibit 15. Although 1st Technology is unable to determine how many Nevada residents and businesses the Bodog Entities have contracted with pursuant to the Affiliate Agreement, the number must be considerable given their continuous marketing and sponsorship activities in the state .

If the Bodog Entities truly believe that they are not subject to Nevada courts, they should be required to affirmatively prove they do not do business in Nevada. They should produce all records relating to their earnings from Affiliate Agreements with Nevada residents and businesses. They should be required to provide payment records, tax returns, bank records, contacts copies, and

- 11 -

other information relating to their Affiliate Agreements with Nevada residents and businesses. They should also be required to disclose all individuals, including athletes and gamblers, that they sponsor in Nevada and all transactions they have engaged in with those individuals. Then they should be forced to produce a roster of all Nevada residents and entities with whom they have transacted business. The Bodog Entities' owner, Calvin Ayre, should be forced to testify at an evidentiary hearing if the Court wishes to entertain their jurisdictional arguments.

The Bodog Entities' discussion about alleged jurisdictional is typical. They have always maintained that they are above American law. Their attorney even said that the Bodog Entities "are arguing that they are not and have not been subject to U.S. jurisdiction." See September 27, 2007 declaration of James Nguyen, attached to defendants' opposition, at 2. Nonetheless, they continue to earn billions of dollars from American customers. In the past, the Bodog Entities have played a cat-and-mouse game with American authorities and courts to avoid recourse for their wrongful acts, including their refusal to pay taxes in the United States, their defiance of American prohibitions on certain internet gambling operations, and their exploitation of American patents.[4] The Bodog Entities cannot have it both ways and their unsupported jurisdictional claims should be rejected.

4.    **1st Technology's Motion is Not Futile**

Under the Bodog Entities' bizarre futility argument, any entity owning and operating a website can disregard patent laws, civil judgments, and American law generally. Without domain names and web traffic, the Bodog Entities have no business.[5] These are two of the Bodog Entities' key assets. It is these assets 1st Technology seeks to prohibit the Bodog Entities from moving overseas. Otherwise, the Bodog Entities will be empowered to avoid this Court's judgment.

---

[4] And in an ultimate act of disingenuousness, the Bodog Entities now seek constitutional protections from the United States, whose jurisdiction and laws they have grown so adept at ignoring.

[5] If their domain names had "little or no inherent value," presumably the Bodog Entities would not have changed them twice in the past month to reroute their business to off-shore servers.

5.  **The 1st Amendment Does Not Protect the Bodog Entities' Illegal Conduct**

Bodog's First Amendment arguments are red herrings. First, corporate speakers enjoy a lesser degree of First Amendment protection than do individual speakers. Central Hudson Gas & Electric Co. v. PSC, 447 U.S. 557, 566-68 (1980). Regulating statements made in the commercial context raises far fewer First Amendment concerns than do statements made in other contexts, such as in a political campaign. Id. Second, restrictions on speech are permitted for a variety of different reasons and in a variety of different contexts. See, e.g., Rotunda & Nowak § 20.36 (discussing accommodation between free speech and copyright protection); Village of Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 637 (1980) (government can prohibit and punish conduct that amounts to fraudulent misrepresentation). There is no First Amendment exception for advertising gambling websites, particularly advertising or expression made to frustrate or defraud creditors.

As relevant to the issues raised by Bodog, courts have held up regulations restricting fraudulent transfers and other regulations involving bankruptcy reorganizations notwithstanding the effect of such regulations on speech. See, e.g., In re Stonegate Sec. Services, Ltd., 56 B.R. 1014 (D. Ill. 1986) (even "public criticism" can be restricted upon finding of "clear and present danger of some significant interference with the debtor's reorganization, or with the functions of the bankruptcy court"). Stonegate recognized that speech taken to frustrate a bankruptcy reorganization may be curtailed, and cases relying on it adopt this approach, notwithstanding purported First Amendment concerns. See, e.g., In re Andrus, 189 B.R. 413 (D. Ill. 1995) (finding that bankruptcy court properly enjoined speech based on finding that the speech was intended to frustrate the bankruptcy reorganization).

The Bodog Entities cannot wield constitutional protections so they can continue to perpetrate illegality. In Lamar Outdoor Advertising, Inc. v. Mississippi State Tax Comm., 701 F.2d 314 (5th Cir. 1983), that court stated "we believe that the policies underlying First Amendment protection of commercial speech require that the 'unlawful activity' exception be limited to those categories of commercial speech already identified by the Supreme Court-those that propose a

transaction illegal in itself, or actively promote illegal activity. The First Amendment value of commercial speech derives from its informational function." Here, the Bodog Entities ask that this Court permit them to continue to violate well-established American law prohibiting off-shore gambling operations. The law does not afford them such protection.

More fundamentally, the Bodog Entities seek to distract the Court from 1st Technology's desired end. The Bodog Entities can "speak" to their customers as much as they want. 1st Technology has absolutely no interest in prohibiting the Bodog Entities from communicating with their customers. This motion is not about prohibiting the Bodog Entities' speech; it is about preventing their fraudulent transfer of assets overseas. 1st Technology simply wants the Bodog Entities to cease moving their assets, such as web traffic, overseas. The First Amendment Argument is therefore a red herring.

6.    **The "Patent Trolls" Label Is Ridiculous**

Both in their brief and on their owners' website[6], the Bodog Entities' insist that 1st Technology is a "patent troll" who is exploiting them. This is totally inaccurate and is, like so much of the Bodog Entities' opposition, not supported by any affidavit or other evidence.

In fact, 1st Technology is not "merely a licensing entity." As described in the attached declaration, 1st Technology is in the process of developing software that will legally compete with Bodog. See June 22, 2007 affidavit of Scott Lewis, a true and correct copy of which is attached hereto as exhibit 16 (where it is noted that "1st Technology LLC . . . has developed software and applications which utilize 1st Technology's intellectual property embodied in the '001 patent.").[7] This software, which will be superior to Bodog's programs, is far along in the development process.

---

[6] On www.calvinayrelife.com/page/2/, the Bodog Entities' owner repeatedly refers to 1st Technology as a "patent troll." He also makes other defamatory remarks about 1st Technology and its owner. See exhibits 3 and 4

[7] Attached to this reply as exhibit 17 is the affidavit of Kevin M. Sutehall, Esq., which verifies exhibits 1 to 15 to this reply.

- 14 -

Even if it was not producing software, 1st Technology would be the sole owner of a United States patent. Under the Bodog Entities' "patent troll" implication, an inventor could not protect his invention unless he distributed a final product concurrently with the registration of his patent. This is nonsense and ignores market realities. A small company would be ill-advised to compete with large, multinational companies before it develops a superior product.

The "patent troll" allegation is one leg of the Bodog Entities' multi-pronged attack. The Bodog Entities have engaged in a legal, albeit unpersuasive, attempt to dispose of 1st Technology's valid judgment via their motion to set aside. Next, they have begun to defame 1st Technology. See exhibits 3 and 4. Third, they have moved their assets overseas. Only one of these activities is legitimate. The other are illegal. 1st Technology will likely file a separate motion to stop Calvin Ayre's and the Bodog Entities' defamation. In the meantime, it simply asks the Court to prevent the ongoing, illegal transfer of the Bodog Entities' assets overseas.

### 7. The Bodog Entities Should be Forced to Transfer Their Trademarks to 1st Technology

In their opposition, the Bodog Entities mention their single asset that remains beholden to United States law: their trademarks.[8] These trademarks are apparently the Bodog Entities' only asset that they have not yet smuggled out of the United States or into a shell company. Given the Bodog Entities' history of fraudulent transfers, 1st Technology is understandably concerned that they will cause the trademarks to vanish, whether through fraudulent conveyances or otherwise.

1st Technology requests, based on the grounds discussed above and in its motion, that the Court enter an order prohibiting the Bodog Entities from transferring or in any way disposing of their trademarks. Furthermore, given the Bodog Entities' habitual defiance of the United States and its law, the Court should also require the Bodog Entities to turn over their trademark rights to the Court pending their satisfaction of 1st Technology's judgment.

///

---

[8] Not surprisingly, the Bodog Entities ask this Court to enforce their alleged trademark rights while denying that the Court has the authority to hear claims against them.

- 15 -

Furthermore, until the Bodog Entities satisfy the judgment 1st Technology should be granted unconditional use of all Bodog trademarks. Such an order would permit 1st Technology to utilize the Bodog Entities' only remaining United States asset to satisfy the underlying debt. 1st Technology would, of course, not engage in the kind of illegal conduct on which the Bodog Entities and Calvin Ayre have built their empire.

**8.    Conclusion**

For the reasons discussed in its motion and above, 1st Technology respectfully requests that the Court enter an order:

(1) An Order enjoining the Bodog Entities, their agents, or agencies, persons or entities from directing their customers and traffic to "BodogLife.com" or any other website besides "NewBodog.com";

(2) An Order requiring the Bodog Entities to email their customers to return to the NewBodog.com domain name;

(3) An Order requiring the Bodog Entities to cease using the BodogLife.com site for their Bodog operations pending the outcome of their motion to set aside;

(4) An Order requiring the Bodog Entities to post a $9.3 million bond;

(5) An Order requiring the Bodog Entities to transfer their trademarks to 1st Technology until they satisfy the outstanding judgment;

(6) An Order permitting the Bodog Entities to all legal uses of all Bodog trademarks until the Bodog Entities satisfy the outstanding judgment;

(7) An Order requiring the Bodog Entities to disclose all records reflecting all of their contracts, transactions, and interactions with Nevada, its residents, and its businesses;

///
///
///
///

(8) An Order requiring Bodog owner Calvin Ayre to appear to answer questions concerning the Bodog Entities' contacts with Nevada, its residents, and its businesses;

DATED this 2nd day of October, 2007.

HUTCHISON & STEFFEN, LLC

/s/ Mark A. Hutchison

Mark A. Hutchison (4639)
L. Kristopher Rath (5749)
Hutchison & Steffen, LLC
Peccole Professional Park
10080 Alta Drive, Suite 200
Las Vegas, Nevada 89145

Attorneys for Plaintiff
1st TECHNOLOGY LLC

- 17 -

## CERTIFICATE OF SERVICE

I certify that I am an employee of HUTCHISON & STEFFEN, LLC and that on this 2nd day of October, 2007, I caused the above and foregoing document entitled: **PLAINTIFF 1ST TECHNOLOGY LLC'S REPLY IN SUPPORT OF ITS SECOND MOTION FOR PERMANENT INJUNCTION AGAINST DEFENDANTS BODOG ENTERTAINMENT GROUP, S.A., BODOG.NET, AND BODOG.COM ON AN ORDER SHORTENING TIME, PURSUANT TO LR 6-1(a), ORAL ARGUMENT REQUESTED** to be served via electronically through ECF/PACER to the attorneys listed below:

**Charles McCrea, Esq.**
Lionel, Sawyer & Collins
1700 Bank of America Plaza
300 South Fourth Street
Las Vegas, Nevada 89101
*Counsel for Defendant Bodog Entertainment Group, S.A.*

**James D. Nguyen, Esq.**
Foley & Lardner, LLP
2029 Century Park East, 35th Floor
Los Angeles, California 90067-3021
*Co-Counsel for Defendant Bodog Entertainment Group, S.A.*

**Andrew P. Gordon, Esq.**
McDonald Carano Wilson
2300 W Sahara Avenue
Suite 1000-10
Las Vegas, Nevada 89102
*Counsel for Defendant Rational Poker School Limited*

_____
An employee of Hutchison & Steffen, LLC